IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Mary Ann Bender**, *et al*.<br><br>**Plaintiffs**<br><br>v.<br><br>**Wiegand Sports GmbH**, *et al*.<br><br>**Defendants** | **Case No. 1:23-cv-01511-MJM** |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

Plaintiffs, Mary Ann Bender and Eric Piper, as Parents and Next Friends of C.P., a Minor, and MaryAnn Bender and Eric Piper, in their Individual Capacities, by and through their attorneys, Gregory G. Hopper and Bekman, Marder, Hopper, Malarkey & Perlin, LLC, hereby file this Motion for Leave to File a Second Amended Complaint against Defendants, Wiegand Sports GmbH, Pacific Group Resorts, Inc., and Everbright Pacific LLC, and, in support thereof, state as follows:

**Introduction**

In the above-captioned matter, MaryAnn Bender and Eric Piper seek to recover compensatory and punitive damages for injuries suffered by their then nine-year-old son, C.P., and Ms. Bender when C.P. was partially ejected from a moving mountain coaster sled at Wisp resort on January 15, 2022. They are suing three defendants – Wiegand Sports GmbH ("Wiegand"), the German company that designed, manufactured, and installed the mountain coaster and coaster sleds at Wisp; Pacific Group Resorts, Inc. ("Pacific Group"), the company that owns Wisp and the mountain coaster, and makes the resort's major operational decisions; and Everbright Pacific LLC ("Everbright Pacific"), the company that operates the resort and mountain coaster on a day-to-day basis, employs the people who work there, and works with Pacific Group to make a myriad of

short, medium, and longer term decisions. Ms. Bender and Mr. Piper's claims sound in strict products liability, negligence, gross negligence, and intentional torts.

When Ms. Bender and Mr. Piper drafted and filed their original Complaint and Amended Complaint in this case, discovery was still in its early phases and they did not have access to critical information about a number of critical issues: Wiegand's ongoing design and development of their mountain coasters and the restraint systems and retractors incorporated into them; what warnings, instructions, and training Wiegand gave to the Wisp Defendants and their predecessors regarding the restraint systems and other safety issues at the time of sale and installation; why so many ejections had occurred at Wisp in the ten years prior to the ejection at issue and on Wiegand coasters at resorts across the country; what communications Wiegand and the Wisp Defendants had relating to the prior ejections and their causes; what Wiegand, the Wisp Defendants, and other resort owners had done and were doing to protect riders from being seriously injured and killed as a result of ejections; and others. So Ms. Bender and Mr. Piper did what they could: they pled their claims in broad terms based on the information that was available to them at the time from a variety of public sources.

Though progress has been made, there is still work to be done. Fact discovery is ongoing. The parties have scheduled a number of fact depositions and more are being scheduled, and they are still producing relevant documents. Expert discovery is coming. The parties have expert designation deadlines in April and May, and there will be a number of expert depositions after that point. In the midst of all of this, the parties have agreed and scheduled a settlement conference at the end of March. And motions practice is coming. There are no pending motions at this point, but Defendants are likely to challenge the sufficiency of Plaintiffs' legal theories, claim for punitive damages, and other issues in the future.

As Ms. Bender and Mr. Piper see it, now is an appropriate time to narrow the factual issues

and conform the pleadings to the facts obtained in discovery to date. The three-year anniversary of the occurrence is upon us, enough discovery has been conducted for the parties to understand the issues and the strengths and weaknesses of their claims and defenses, and the pleadings should be put into form before motions practice begins in earnest. To that end, Ms. Bender and Mr. Piper submit this Motion seeking leave to file a Second Amended Complaint. A copy of the Second Amended Complaint is attached as **Exhibit 1**, and a redline comparing the Amended and Second Amended Complaints is attached as **Exhibit 2**.

## Consent

Per the Local Rules, Plaintiffs' counsel sent a copy of the Second Amended Complaint and the redline to Defendants' counsel last week and asked for their clients' consent to file it. This followed other conversations about a Second Amended Complaint earlier in the discovery process. Unfortunately, Defendants' counsel were not able to respond to the request in the time given. Should Defendants' counsel provide their clients' consent after the filing of this Motion, Plaintiffs agree to file a line to that effect.

## Legal Standard

The Federal Rules of Civil Procedure were promulgated in 1938 to enable civil disputes to be decided on their merits rather than on the basis of technicalities. *See* Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits* 88 N.Y.U. Law Rev. 266 (April 2013). Inflexible pleading requirements had created a "quicksand of motion practice and a premature graveyard for many potentially meritorious claims." *Id*. at 333. Recognizing that parties often lacked access to "critical information" until they had gone through the discovery process, and that it was "futile and a bit absurd to tell someone to plead what he or she does not know and cannot access," the drafters created a system, drawn from federal equity practice, with a "justice-seeking ethos:" a flexible and "easily satisfied pleading regime for stating a grievance," "wide-

angled discovery" to allow parties to uncover otherwise unavailable facts, and the deferral of motions practice on the merits based on the totality of the information collected. *Id*. at 288-89, 332-33.

Fed. Rule Civ. P. 15 governs when and under what circumstances a party can amend its pleadings before, during, and after trial, whether with the opposing party's written consent or with leave of court. *See* Rule 15(a)(2). Leave to amend is to be freely given, especially when the amendment simply conforms the original pleading to the proof obtained during discovery, unless doing so would introduce a wholly new cause of action, disadvantage the opposing party, or necessitate a continuance of the trial. *See, e.g., Mack v. Porter*, 72 F. 236, 242-43 (4th Cir. 1896). Even then, it is a matter left to the trial court's discretion. As the Court of Appeals for the Fourth Circuit has noted, trial courts are to "liberally allow amendment," *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010), because doing so serves the wider federal policy of resolving cases on the merits, instead of on technicalities. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, 674 F.3d 369, 379 (4th Cir. 2012).

In determining whether to deny a motion seeking leave to amend, trial courts look to three factors: prejudice to the opposing party, bad faith, or the futility of the amendment. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). Recognizing that factual developments can come later in the process, it is well-established that delay alone is not enough to justify the denial of a motion seeking leave to amend, though, in certain circumstances, it can establish bad faith and prejudice. *See id*.

## Argument

**A.  The factual allegations contained in the Second Amended Complaint narrow the issues in this case, they are based on information obtained during discovery, and they reflect what Plaintiffs believe they will be able to prove at trial.**

When Ms. Bender and Mr. Piper filed their initial complaint and Amended Complaint, they

based their allegations on what they could from publicly available information, prior incidents at Wisp and at other resorts with Wiegand mountain coasters, the State of Maryland's investigation into the incident at issue, and prior claims made against Wiegand and the Wisp Defendants. They did not have access to Wiegand or the Wisp Defendants' internal documents, the attendants who were working on the date of the occurrence, the manuals and training material Wiegand provided and the Wisp Defendants, and a host of other material.

As a result, the factual allegations made in the Complaint and Amended Complaint were necessarily broad. Ms. Bender and Mr. Piper made broad allegations regarding coaster and coaster sled design, what Wiegand and the Wisp Defendants knew or did not know, what the attendants at issue had been told to do, and what Wiegand and the Wisp Defendants could have known if they had looked at publicly available sources of information.

Now, Ms. Bender and Mr. Piper have much more detailed information. Among other things, they have discovered the following:

- The retractor connected to C.P.'s seatbelt – the device connected to a seatbelt that dictates when and how belt webbing is extended (plays out) or is reeled in (retracted) based on a rider's movement and when it locks in place to prevent additional extension – was an Emergency Locking Retractor ("ELR"). By design, it was only supposed to lock with sudden, intense body movement, not the slower movement at issue as C.P.'s body moved in his seat around the first and second turns.

- Wiegand could have designed and manufactured its coaster sleds with an Automatic Locking Retractor ("ALR"). By design, an ALR will reel-in (retract) any slack that is present between the webbing and the rider's body, but it will not allow seatbelt webbing to play out (extend) when a rider's body pushes against it.

- The coaster sleds Wiegand manufactured and sold between 2005 and the early 2010s were equipped with ELRs. Over time, Wiegand decided to switch to ALRs. Wiegand told its existing customers that it would continue to sell ELRs until the existing stock sold out, but it was not ordering more and it was no longer going to use them in new sleds.

- Wiegand sent Wisp and other existing customers sales letters touting a number of changes to the restraint system on its coaster sleds. One of these changes was the shift from ELRs to ALRs. It touted its design change as an "upgrade," but its offers bundled all of the changes together, making the total cost much higher than simply changing the retractors.

- Wiegand informed Trish Bietzel, the person the Wisp Defendants tasked with overseeing the mountain coaster at Wisp, that it was discontinuing its ELR system, adopting an ALR system, and, offered to "upgrade" the sleds' restraint system. Ms. Bietzel spoke to Ron Hawkes, the general manager for Wisp, about the change, and the two of them jointly recommended that Pacific Group and Everbright Pacific purchase the upgraded restraint systems.

- Despite the offer made by Wiegand and the recommendations of Ms. Bietzel and Mr. Hawkes, Pacific Group and Everbright Pacific refused to upgrade its sleds' restraint system, saying it was too costly.

- Pacific Group and Everbright Pacific continued to operate the mountain coaster with the discontinued ELRs. Instead of purchasing them, it sought to salvage ELRs from other resorts that had retired its older sleds.

- It does not appear that Wiegand ever offered to sell the new ELRs to the Wisp Defendants or its other resorts without the other add-ons that made the "upgrade" so expensive.

- At or around this same time, Wiegand produced a safety sign warning that seatbelt slack was potentially dangerous and emphasizing the importance of the seatbelt being worn tight across a rider's body. This information had never been included in Wiegand's manuals, instructions, or signs, and it does not appear in the training material provided by Wiegand or used at Wisp.

- Despite the fact that Wiegand's new sign was filling a hole in its prior warnings, instructions, and manual, it did not give the new sign to Wisp or its other resorts, nor did it subsidize the cost of the sign. Instead, Wiegand attempted to profit from its new sign, offering to sell it to Wisp and other resorts at a premium.

- After Wiegand informed Ms. Bietzel that it had a new safety sign, she discussed the need for it with Mr. Hawkes and they jointly recommended that Pacific Group and Everbright purchase the new sign so their employees could put it up where their attendants and riders could see it.

- Despite the offer made by Wiegand and the recommendations of Ms. Bietzel and Mr. Hawkes, Pacific Group and Everbright Pacific refused authorize the purchase of the new sign, saying it was too costly.

- Pacific Group and Everbright Pacific continued to operate the mountain coaster without a sign warning about the importance of keeping the seatbelt close to the body, and there is no evidence that it conveyed this information to its attendants.

- Maintenance records from Wisp indicate that before the date of the occurrence, a number of sleds had been temporarily taken out of service because their seatbelt webbing had become doubled-over or twisted, blocking the retractor and preventing it from taking slack out of the system.

- The instructions and training provided by Wiegand, both at the time of sale and afterwards, never mentioned this issue, what to look for, or how it could cause or contribute to ejections.

- Between 2008 and 2020, a number of riders at Wisp were ejected from mountain coaster sleds. Several of these people were seriously injured, and most of them were ejected while going around the third turn, the same turn at issue in this case.

- The Wisp Defendants notified Wiegand of at least some of these incidents. It is unclear whether Wiegand did anything to investigate them, or any of the other incidents that occurred at any other resort.

- Wiegand and the Wisp Defendants' attendants and management knew that the third turn was the sharpest, tightest, and fastest turn, the one most likely to cause an ejection. It appears that Wiegand and the Wisp Defendants made no efforts to address this risk.

- In 2021, an unbelted rider was ejected from a mountain coaster sled at Wisp as it went around the third turn. He subsequently died of his injuries. Video of the loading station shows that the loading station attendant and top station attendant failed to check the rider's belt and did not lift-up on it to make sure it was buckled and retracting properly.

- Wisp notified Wiegand of the 2021 fatality. It is unclear whether Wiegand did anything to investigate it.

- Based on the 2021 incident, Mr. Hawkes claims to have decided that Wisp's mountain coaster attendants needed improved training and supervision so that they would check riders' seatbelts before each and every ride.

- Mr. Hawkes had not been aware that there had been prior ejections at Wisp until after the 2021 incident.

- When asked about any changes made to the mountain coaster training at Wisp, either in substance or in its cadence, two of the attendants working at the time of C.P.'s ejection stated that, from their perspective, nothing changed between 2021 and 2022: no one told them that the loading or top station attendants involved in the 2021 incident failed to check the rider's belt, and no one told them that the rider died of his injuries. In fact, they testified that Mr. Hawkes, Ms. Bietzel, and others never talked to them about the prior incident, why it happened, or what could have been done to prevent it.

- Two of the attendants who were working at the time of C.P.'s ejection stated that they would have wanted to know that an unbelted rider going around turn 3 had been ejected and later died. It would have emphasized the importance of what they were doing.

- Andrew Younkin was the mountain coaster attendant who was involved in loading Ms. Bender and C.J. into the coaster sled at issue. His coworkers considered him to be the least attentive and conscientious attendant who worked on the mountain coaster ride at Wisp.

- Prior to the ride at issue in this case, C.P.'s seatbelt already had slack in it. Video immediately before the incident shows part of the seatbelt hanging loosely on the side of the sled, suggesting that it was folded or twisted and could not completely retract before Ms. Bender and C.P. began their ride. This is also supported by the report of the State investigator after the occurrence.

- Mr. Younkin saw the slide dangling from the side of the coaster. This indicated that the belt was folded or twisted inside the body of the sled and was not fully retracting. Instead of fixing the problem or taking the sled out of service, Mr. Younkin just moved it back inside the cart.

- Mr. Younkin was supposed to look at Ms. Bender and C.P.'s seatbelts and pull-up on them to make sure they were buckled and retracting properly. He did not do these things. In fact, video taken before the occurrence showed that he repeatedly failed to talk to riders, provide them with any instruction, visually check their seatbelt to make sure it was latched, or pull-up on their seatbelts to make sure they were latched and were properly retracting.

- The top station attendant, Marylysse Calling, was supposed to check to make sure Ms. Bender and C.P.'s seatbelts were functioning properly before allowing them to begin their descent down the track. She saw that they were wearing their belts, but did nothing else before letting them go.

Ms. Bender and Mr. Piper had to conduct substantial discovery to learn about these events and to understand their importance. Though Defendants had this information, Plaintiffs did not have access to it until after the amendment deadline passed.

**B.     Allowing Ms. Bender and Mr. Piper to file a Second Amended Complaint would not introduce a new cause of action, disadvantage or prejudice Defendants, or affect the schedule.**

The Second Amended Complaint reflects information obtained from Defendants during discovery. This is information that Wiegand, Pacific Group, and Everbright Pacific, and their employees had all along and comes as no surprise to them. It does not change the claims being made or the relief being sought. And it does not introduce a wholly new cause of action, disadvantage or prejudice Defendants, or necessitate a continuance of the trial date.

First, the legal claims made in the Amended Complaint and Second Amended Complaint remain the same – strict products liability, negligence, gross negligence, and intentional tort – and both seek compensatory and punitive damages. The Second Amended Complaint contains the

exact same legal theories, and the only change made is that it splits the gross negligence, strict liability, and intentional torts claims against the Wiegand Defendants into separate counts.

Second, the Amended Complaint contained broader allegations that the Second Amended Complaint narrows. In the Amended Complaint, Ms. Bender and Mr. Piper alleged that the coaster sled's retractor failed to work properly, the retractor failed to remove adequate slack, C.P. was inadequately restrained because of excessive slack, the loading station attendant (identified using the wrong name in the Amended Complaint) was inattentive and did not notice a potential problem with the seatbelt before or after C.P. was seated in the sled, the warnings and instructions posted were inadequate, the warnings and instructions did not mention slack or the risk of ejection, and the attendants who worked on the day of the occurrence were improperly supervised. They also alleged that Wiegand and/or the Wisp Defendants knew that people were being ejected, knew that attendants were being inattentive, and made conscious decisions not to address these issues, consciously disregarding the danger to C.P. and others. The allegations in the Second Amended Complaint simply refine these allegations based on what was learned during discovery.

Third, Defendants cannot claim that allowing the Second Amended Complaint would disadvantage or prejudice them or amounts to a surprise attack. All of the information contained in the Second Amended Complaint came from Defendants' records and employees, and it describes communications and interactions they had over years. Defendants knew about these facts all along and they cannot feign surprise now. Further, discovery is still open and ongoing, no experts have been designated, and Defendants have every opportunity to address these allegations on the merits, meaning that Defendants have time to react to these changes.

Fourth, allowing Plaintiffs to file the Second Amended Complaint would not affect the schedule in the case. As outlined above, the case is ongoing and there is ample time to address the narrower allegations made. Trial is more than 16 months away.

Lastly, granting leave to file a Second Amended Complaint is in keeping with the purposes of the Federal Rules. As outlined in the Standard section, amendments are to be liberally granted, especially when they only seek to conform the pleadings to the facts adduced during discovery. Allowing the filing focuses the Court and the parties on the specific factual issues that will be discussed at trial, prevents Plaintiffs from having to make pre-trial, trial, or post-trial requests for amendments, sets the case up for a decisions on the merits. Plaintiffs could have stood pat and not requested to file a Second Amended Complaint, taking the position that their prior pleadings were adequate and then defending against summary judgment, but they wanted to be proactive and avoid disputes later on. This is wholly in keeping with the purpose of Rule 15.

## **Conclusion**

WHEREFORE, and for the foregoing reasons, Plaintiffs, Mary Ann Bender and Eric Piper, as Parents and Next Friends of C.P., a Minor, and MaryAnn Bender and Eric Piper, in their Individual Capacities, hereby request that the Court grant them leave to file the attached Second Amended Complaint (attached as Exhibit 1).

Respectfully submitted,

*/s/Gregory G. Hopper*
GREGORY G. HOPPER
Bekman, Marder, Hopper, Malarkey & Perlin, LLC
1829 Reisterstown Road, Suite 200
Baltimore, Maryland 21218
410.539.6633 (telephone)
410.625.9554 (facsimile)
hopper@mdtrialfirm.com

Attorneys for Plaintiffs